| | |
|---|---|
| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| GUILFORD COUNTY | 17-CVS-1117 |



PACKRITE, LLC,

    Plaintiff,

v.

GRAPHIC PACKAGING
INTERNATIONAL, INC.,

    Defendant.

**COMPLAINT**

**(Jury Trial Demanded)**

NOW COMES Plaintiff PACKRITE, LLC, by and through its undersigned counsel, complaining of the Defendant GRAPHIC PACKAGING INTERNATIONAL, INC., and alleges the following:

## PARTIES AND JURISDICTION

1. Plaintiff PACKRITE, LLC, (hereinafter the "**Plaintiff**" or "**Packrite**"), is a limited liability company organized and existing under the laws of the State of North Carolina with its principal office and place of business in High Point, Guilford County, North Carolina.

2. Upon information and belief, Defendant GRAPHIC PACKAGING INTERNATIONAL, INC. (hereinafter the "**Defendant**" or "**GPI**") is a corporation organized and existing under the laws of the State of Delaware with its principal office and place of business in Atlanta, Georgia. GPI is duly-registered and authorized to conduct business in the State of North Carolina.

3. This Court has jurisdiction over the subject matter of this action and the parties hereto. Venue is proper in Guilford County, High Point, North Carolina.

1

EXHIBIT D

Case 1:17-cv-01019-LCB-LPA   Document 2   Filed 11/08/17   Page 1 of 19

## FACTS

4. Packrite is a specialized trade finisher for the corrugated and folding carton packaging industries. Packrite provides its specialized services in a wide range of industries including, without limitation, pharmaceuticals, software, household products and food and drink packaging.

5. GPI is, upon information and belief, one of the world's largest manufacturers of folding cartons, unbleached paperboard and coated recycled board, with such products being used in packaging for the food, beverage and consumer product industries.

6. In or around 2012, a senior member of GPI's management team named Tom Fester contacted Packrite to engage Packrite's services at a time when certain of GPI's company-managed production facilities were experiencing production difficulties and problems filling certain of GPI's customer's orders. In particular, Packrite was requested at that time to assist GPI in regard to GPI's facility located in Solon, Ohio (the "**Solon Facility**").

7. Specifically, as a result of significant production problems at the Solon Facility, GPI called upon Packrite to, among other things, produce a large volume of GPI's customer orders, which the Solon Facility was itself unable to produce and fill. Upon further information and belief, GPI's management internally referred to this matter involving the Solon Facility as "Project Phoenix."

8. Thereafter, beginning in or around 2012, Packrite began working closely with the Solon Facility and GPI's management in furtherance of "Project Phoenix," among other projects, and began conducting regular business with GPI.

9. In furtherance of "Project Phoenix," Packrite regularly ran production at its facilities that was unable to be run at the Solon Facility due to ongoing and pervasive production

difficulties. Packrite regularly assisted GPI in meeting its customer's requirements for the timeliness and quality of the products it produced.

10. Upon information and belief, "Project Phoenix" was later abandoned by GPI.

11. In return for Packrite's significant assistance in regard to "Project Phoenix," as well as other projects, GPI directed orders to Packrite for the production of its customers' products, but otherwise, early in the parties' business relationship, never offered any assurances of a long-term agreement for any particular quantity of business that would be directed to Packrite by GPI. Nonetheless, Packrite consistently and continuously used its best efforts to assist GPI in connection with "Project Phoenix" and its other business pursuits, all in good faith.

12. Upon information and belief, it was not in 2012, and is not at the present time, the typical business practice of GPI to enter into long term contracts with its vendors. Rather, GPI regularly engages its vendors on an "as needed" basis by issuing individual purchase orders. At all times prior to mid-2016, GPI and Packrite engaged in business upon such terms.

13. From and after the start of their business relationship in 2012, Packrite reasonably believed that Packrite and GPI shared a business relationship of mutual trust, confidence and cooperation, in all respects.

14. At all times relevant, Packrite consistently used its best efforts to assist GPI and trusted what it was told by GPI's management in regard to all present and anticipated future business matters.

**The Clorox Business**

15. In approximately August, 2016, Packrite was contacted by Tom Fester, Chris Berndt and/or Jeb Pfeifle of GPI urgently seeking Packrite's assistance in producing the

3

packaging for "Clorox Kitty Litter," which packaging, upon information and belief, GPI had contracted to produce at that time (the "**Clorox Business**").

16. At that time, upon information and belief, GPI did not have the resources, equipment or capacity to undertake the Clorox Business itself, but instead, required the services of Packrite to do so.

17. Upon information and belief, the Clorox Business was part of a very large contract obtained by GPI, and its successful production was essential to its ability to perform under such contract. To that end, GPI specifically informed Packrite that the Clorox Business was part of a "major initiative" for GPI and, thus, was a matter of great importance to the company.

18. Accordingly, GPI, through Tom Fester, Chris Berndt and/or Jeb Pfeifle, specifically requested Packrite's assistance and production capacity in connection with the Clorox Business that GPI was required to fulfill under, upon information and belief, the terms and conditions of its large contract with the Clorox Company.

19. In connection with such request, GPI, through Tom Fester, Chris Berndt and/or Jeb Pfeifle, specifically requested that Packrite commit a significant amount of resources, as well as a large amount of its overall production capacity on a weekly basis, to GPI's fulfillment of its contractual obligations related to the Clorox Business, as GPI lacked the equipment and/or capacity to produce the required products itself at that time.

20. Packrite was specifically requested by GPI to temporarily meet GPI's urgent needs in connection with the Clorox Business for a period of time sufficient to allow the Solon Facility to upgrade and install new equipment required for the undertaking of the production of the Clorox Business. Particularly, the Solon Facility undertook the installation of a new "cutter"

4

and a new "folder / gluer," which installation would not be completed until sometime in 2017. Additionally, Packrite was informed that the Solon Facility was generally overbooked and, thus, lacked sufficient capacity to fulfill GPI's urgent need to produce product in connection with the Clorox Business.

21. At the time of GPI's request of Packrite in connection with the Clorox Business in mid-2016, Packrite itself lacked sufficient manpower, capacity and all of the equipment necessary to fulfill GPI's needs. While Packrite had the ability to "ramp up" production relating to the Clorox Business much more rapidly than would have been possible at the Solon Facility, doing so would require the expenditure of a significant amount of resources on the part of Packrite, including, without limitation, the addition of employees, expensive equipment, and the dedication of a significant amount of time and effort.

22. Further, because GPI had requested that Packrite dedicate a very significant amount of its production capacity to the Clorox Business to assist GPI in fulfilling its urgent need, in undertaking to do so, Packrite necessarily would be prevented from either seeking or obtaining additional business from other sources, as it had a finite amount of production capacity. If Packrite accepted GPI's request made in connection with its "major initiative" relating to the Clorox Business, Packrite's capacity to either seek out and/or undertake other work unrelated to GPI would necessarily be extremely limited.

23. Additionally, at all times, it was known and understood by both GPI and Packrite that a major part of the Clorox Business would not constitute a long-term opportunity for Packrite. Rather, at all times, it was known and understood that Packrite would merely serve as a "stopgap" for GPI while the necessary equipment was installed at the Solon Facility.

24. Accordingly, as Packrite's undertaking to assist GPI in connection with the Clorox Business would represent a major dedication of Packrite's time, effort and money to what was known by all parties to be a short-term project, Packrite was initially unwilling to assist GPI in connection with its onboarding of the Clorox Business.

**The Beer Carton Contract**

25. After Packrite expressed its concerns and initial unwillingness to enter into an arrangement with GPI to assist it in connection with the onboarding of its Clorox Business due to the excessive amount of cost, time, effort and potential for loss of other opportunities for what was, for Packrite, a short term project, GPI, through Tom Fester, Chris Berndt and/or Jeb Pfeifle, raised a new matter in an attempt to induce Packrite to assist GPI in connection with the Clorox Business – the offer of a long-term contract to produce GPI's requirements of certain "roll to roll 18/12 MillerCoors cartons" (the "**Beer Cartons**").

26. In or around August, 2016, GPI, through at least Tom Fester, Chris Berndt and/or Jeb Pfeifle, either individually or collectively, engaged in discussions with Packrite in which it was specifically stated that, should Packrite agree to assist GPI in connection with the Clorox Business, and invest the capital and time required to do so to, to the detriment of Packrite's other business prospects, GPI would then agree to enter into a three (3) year contract with Packrite under which Packrite would be the sole producer of GPI's requirements of Beer Cartons (the "**Beer Carton Contract**").

27. In so offering, upon information and belief, GPI knew and understood that the same or similar equipment, staffing and processes would be used by Packrite in connection with its production of Beer Cartons as would be utilized by it in conjunction with its work on the Clorox Business, if Packrite elected to undertake to assist GPI in that regard. As such, when

6

Packrite's work on the Clorox Business was to later be transitioned to the Solon Facility in mid-2017, as was contemplated by all parties from the outset, Packrite would be able to utilize its investment made in conjunction with the Clorox Business in the production of Beer Cartons under the terms and conditions of the long-term Beer Carton Contract.

28. Upon information and belief, the offer by GPI to enter into the Beer Carton Contract was specifically intended by GPI to induce Packrite to assist GPI in fulfilling its immediate needs in connection with the Clorox Business. GPI did so by providing Packrite with an incentive to make the significant investment of capital, time, effort and necessary to satisfy GPI's immediate needs.

29. Specifically, upon information and belief, GPI knew and understood that the prospect of the Beer Carton Contract provided Packrite the incentive necessary to undertake what it was initially unwilling to do for a short term project benefitting only GPI – expend the time, effort and capital necessary to assist GPI in connection with the Clorox Business, all while foregoing new opportunities to expand Packrite's other, separate business opportunities.

30. In or around August, 2016, GPI, through at least Tom Fester, Chris Berndt and/or Jeb Pfeifle specifically and unequivocally represented to Packrite, through its representatives Michael Drummond and Kevin Brown, that the Beer Carton Contract would result in gross revenue of approximately $10,000,000.00 per year to Packrite over the course of its performance of the same.

31. Based solely upon the representations of GPI in regard to the forthcoming Beer Carton Contract, in late August, 2016, Packrite agreed to assist GPI in fulfilling its immediate needs in conjunction with the Clorox Business.

7

32. But for the assurances given by GPI to Packrite in regard to the Beer Carton Contract, Packrite would not have undertaken to assist GPI in connection with the Clorox Business.

33. At the time of its agreement to assist GPI, Packrite reasonably believed and relied upon the truth of GPI's representations regarding the forthcoming Beer Carton Contract, and began taking steps, on an expedited basis, to make the capital and staffing investments necessary to assist GPI in connection with the Clorox Business.

34. Further, as much of its capacity would be exhausted by its production of product for GPI in conjunction with the Clorox Business, at that same time, Packrite began to significantly limit its efforts to locate and onboard new business, separate and apart from GPI.

35. Upon information and belief, the representations of GPI by and through at least Tom Fester, Chris Berndt and/or Jeb Pfeifle, either individually or collectively, in or around August, 2016 regarding GPI's intent to enter into the Beer Carton Contract with Packrite were false when made.

**Packrite's Production of the Clorox Business**

36. Packrite's production assistance to GPI in regard to the Clorox Business was scheduled to begin in approximately November, 2016 and was to run through approximately May or June, 2017, after which time much of the production relating to the Clorox Business would be transitioned to GPI's Solon Facility.

37. To prepare for production beginning in November, Packrite began planning and expending significant time, effort and capital in early September, 2016.

38. At or around that time and in furtherance of the Clorox Business, in reliance upon the continuing assurances given by GPI in regard to the forthcoming Beer Carton Contract,

8

Packrite quickly began hiring new staff, made capital investments to increase its overall production capacity, installed a new quality lab, developed new procedures to meet the unique needs of GPI in conjunction with the Clorox Business, and committed a significant number of hours of training of its workforce in an effort to assist GPI in making its "major initiative" a success.

39. Also in September, 2016, prior to actual production beginning at Packrite on the Clorox Business, representatives of Packrite had a meeting with, at least, Kristopher Dover and Ryan Ingalls of GPI in regard to the specifics of the Beer Carton Contract. Neither at that meeting, nor at any time prior to approximately May, 2017, did GPI give Packrite any indication whatsoever that the Beer Carton Contract would not be forthcoming – to the contrary, all discussions and interactions between the parties from approximately August, 2016 until approximately May, 2017, were consistent with GPI's previously-given assurances that the long term Beer Carton Contract was in process and would ultimately be awarded to Packrite.

40. In approximately November, 2016, Packrite began production of the Clorox Business.

41. The materials and processes utilized in conjunction with the production of the Clorox Business were new and challenging to both GPI and Packrite.

42. GPI employees regularly worked closely with Packrite, and Packrite's employees regularly worked closely with GPI, to ensure that the production of the Clorox Business was timely and of good quality.

43. At every stage of Packrite's production of the Clorox Business, GPI's representatives reviewed and approved the methods and processes used by Packrite, in all respects.

9

44. On a weekly basis, GPI's representatives visited Packrite's facilities in High Point, North Carolina to inspect the products being produced and the production methods being utilized by Packrite in connection with the Clorox Business.

45. In furtherance of Packrite's production of the Clorox Business, at all times relevant, Packrite purchased the "roll stock" raw materials necessary to complete the same from one or more of GPI's affiliated paper mills. At no time did Packrite obtain "roll stock" raw material for usage in conjunction with the Clorox Business from any unrelated third party.

46. In connection with the Clorox Business, GPI issued numerous purchase orders to Packrite, Packrite produced the product ordered in conjunction with each purchase order, and then issued individual invoices to GPI to be paid for its work. GPI agreed to pay Packrite's invoices issued in conjunction with the Clorox Business in a timely manner on "net 15" day terms (the "**Clorox Payment Agreement**").

47. Throughout Packrite's performance of its work upon the Clorox Business – and until approximately May, 2017 – at all times, GPI consistently continued to assure Packrite that the formal, written Beer Carton Contract was forthcoming.

48. To that end, in early 2017, GPI sent to Packrite an initial draft of the Beer Carton Contract, showing as its term January 1, 2017 through December 31, 2019. A true and accurate copy of the document sent to Packrite by GPI is attached hereto as **Exhibit A** and is incorporated herein by reference.

49. Upon review of the foregoing, Packrite made certain proposed revisions to the initial draft of the Beer Carton Contract and returned the same to GPI. A true and accurate of the Beer Carton Contract containing Packrite's proposed revisions is attached hereto as **Exhibit B** and is incorporated herein by reference.

10

50. Packrite never received any response from GPI in regard to its proposed changes to the written Beer Carton Contract, although discussions relating to the same continued through approximately May, 2017.

51. At the same time, Packrite's employees continued to work diligently in furtherance of the continued assurances given by GPI in relation to the Beer Carton Contract.

52. Packrite took numerous, concrete steps in furtherance of the Beer Carton Contract including, without limitation, the expenditure of a significant amount of time, effort and money on a successful completion of a trial run (or "PTP" run) of Beer Cartons in Golden, Colorado. At all times, Packrite continued to take these actions and to forego other significant and definite opportunities to grow its business with other unrelated parties, in reliance upon the continued assurances given by GPI that the Beer Carton Contract would be forthcoming and would be entered into by and between GPI and Packrite, as had been initially represented in or around August, 2016.

53. All actions taken and work performed by Packrite in regard to the Clorox Business from and after August, 2016 was taken in specific reliance upon the continuous and repeated assurances given by GPI to Packrite that the parties would enter into the Beer Carton Contract.

54. However, by approximately early May, 2017 – at or near the time the work on the Solon Facility was being completed such that the Clorox Business would be transitioned from Packrite to that location operated by GPI – Packrite was informed by GPI of several purported "quality claims" in regard to certain of the work it had performed in connection with the Clorox Business.

11

55. In respect to the "quality claims," two (2) primary assertions were made by GPI: 1) that the "glue pattern" on certain of the handles of the kitty litter boxes produced by Packrite was out of specification; and 2) that certain of the products produced were experiencing "ply bond separation" resulting in a defective product being produced.

56. Additionally, at or around the same time, GPI unilaterally, and without notice or consultation with Packrite, changed the payment terms under which it made payments to Packrite under the Clorox Payment Agreement from "net 15" to "net 45" day terms. This unilateral change on the part of GPI caused Packrite substantial issues in regard to its cash flow, especially given the fact that the Clorox Business was occupying such a large part of its overall production capacity.

57. Each of the purported "quality claims" asserted by GPI against Packrite are meritless.

58. In regard to the "glue pattern" claim, GPI's employees specifically examined and pre-approved the "glue pattern" utilized by Packrite in conjunction with its production of the kitty litter boxes in question.

59. In regard to the "ply bond separation" claim asserted by GPI, the root cause of the same was not Packrite's production, but rather was determined to be defective "roll stock" produced by GPI's paper mill.

60. Upon information and belief, the purported "quality claims" were wrongfully and maliciously contrived by GPI as part of a "Project" (the specific internal name of which is presently unknown to Packrite, but may be, upon information and belief, "Project Yodel") to avoid undertaking further business with Packrite and, specifically, to avoid entering into the

12

long-term Beer Carton Contract as had been initially promised to Packrite in conjunction with its agreement to assist GPI with the Clorox Business.

61. However, notwithstanding the contrived "quality claims" asserted to exist by GPI, Packrite continued to perform work on the Clorox Business based upon GPI's specific assurances given of full payment of all amounts due and owing to Packrite under the Clorox Payment Agreement.

62. Upon information and belief, independent of GPI's initial intent with respect to the Beer Carton Contract, at some point in either late 2016 or early 2017, as part of its "Project" relating to Packrite, GPI had internally made the decision not to enter into the Beer Carton Contract with Packrite, contrary to its initial representations to Packrite which GPI knew had induced Packrite to assist with the Clorox Business in the first instance. However, upon further information and belief, as a result of its ongoing needs in conjunction with the Clorox Business, GPI's representatives wrongfully continued to provide Packrite with assurances that the Beer Carton Contract was forthcoming in an effort to induce Packrite to continue production and to forego other business opportunities which, if pursued, would have diverted Packrite's resources from the continued production of the Clorox Business.

63. Further, as a result of the purported "quality claims," GPI has wrongfully failed and refused to pay certain of Packrite's invoices pursuant to the Clorox Payment Agreement, such invoices currently totaling no less than the principal amount of $630,630.43.

64. As of the present date, GPI has not entered into the Beer Carton Contract with Packrite.

65. GPI has wrongfully failed and refused to enter into the Beer Carton Contract with Packrite, contrary to its specific and repeated representations that it would do so.

13

66. Upon information and belief, GPI never intended to enter into the Beer Carton Contract with Packrite.

67. As a direct and proximate result of the fact that GPI has wrongfully failed and refused to enter into the Beer Carton Contract with Packrite, Packrite has suffered significant and calculable damage, including loss of profit and loss of alternative business opportunities.

## FIRST CLAIM FOR RELIEF
(Breach of Contract – Clorox Payment Agreement)

68. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

69. The facts and circumstances described hereinabove constitute a breach of contract for which Defendant GPI is liable to Packrite in an amount not less than the total amount of the outstanding invoices due to Packrite under the Clorox Payment Agreement, the total principal amount of which is presently no less than $630,630.43.

70. Based upon GPI's breach of the Clorox Payment Agreement, GPI is liable to Packrite in an amount not less than $630,630.43, plus interest, costs and fees.

## SECOND CLAIM FOR RELIEF - ALTERNATIVE
(*Quantum Meruit*)

71. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

72. In the alternative, Packrite delivered certain goods to the Defendant GPI, such goods having a value not less than $630,630.43.

73. The Defendant has failed and refused to pay for all goods sold and delivered, such goods having a value not less than $630,630.43.

74. The goods provided by Packrite to GPI had substantial value to GPI.

14

75. The goods provided by Packrite to GPI were timely delivered and, upon information and belief, used by GPI.

76. The goods provided by Packrite to GPI conformed in all respects to the applicable standards of quality.

77. At the time Packrite provided goods to GPI, Packrite reasonably expected to be paid for such goods. The delivery of said goods to GPI by Packrite was not gratuitous.

78. GPI freely and voluntarily accepted the benefits of the delivery of goods by Packrite with the knowledge that Packrite expected to be paid for the provision of such goods.

79. Packrite is entitled to payment from GPI, in *quantum meruit*, in an amount not less than the total amount of $630,630.43, plus interest, costs and fees.

**THIRD CLAIM FOR RELIEF**
(Fraudulent Misrepresentation / Inducement)

80. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

81. Upon information and belief, the specific representations of GPI made to Packrite with respect to the Beer Carton Contract, as set forth hereinabove, were false and wrongful in that, at minimum, GPI never intended to enter into the same with Packrite, but rather were made solely in an effort to induce Packrite to assist GPI in connection with the Clorox Business.

82. Upon information and belief, alternatively and independent of GPI's original intent, the continued representations and assurances of the forthcoming Beer Carton Contract made and given by GPI to Packrite after such time as GPI had made the decision not to proceed with the same, were false and wrongful, and were made solely in an effort to induce Packrite not to abandon its continued efforts upon the Clorox Business, as GPI required Packrite's assistance with the same through, approximately, May, 2017.

15

83. Upon information and belief, the specific representations of GPI made to Packrite with respect to the Beer Carton Contract, as set forth hereinabove, were reasonably calculated by GPI to deceive Packrite by, at least, inducing it to assist GPI in connection with the Clorox Business.

84. Upon information and belief, the specific representations of GPI made to Packrite with respect to the Beer Carton Contract, as set forth hereinabove, were made with the intent to deceive Packrite such that it would agree to assist, and to continue to assist, GPI in connection with its production of the Clorox Business.

85. The specific representations of GPI with respect to the Beer Carton Contract, as set forth hereinabove, did, in fact, deceive Packrite in that Packrite specifically relied upon the representations of, at least, Tom Fester, Chris Berndt and/or Jeb Pfeifle in or around August, 2016, in agreeing to make significant investments further to the assistance of GPI in connection with the Clorox Business and, additionally, in foregoing additional and separate business opportunities beneficial to Packrite.

86. As a direct and proximate result of the specific false representations of GPI as set forth hereinabove, Packrite has suffered significant actual damages, including special damages relating to, at minimum, loss of corporate profit and loss of corporate business opportunities, in an amount in excess of $25,000.00, the exact amount of such damages to be proven in connection with this action.

87. Additionally, pursuant to the provisions of Chapter 1D of the North Carolina General Statutes, the actions and misrepresentations of the Defendant GPI, as alleged herein, were willful, wanton and fraudulent, thereby entitling Packrite to an award of punitive damages.

16

## FOURTH CLAIM FOR RELIEF - ALTERNATIVE
(Negligent Misrepresentation / Detrimental Reliance)

88. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

89. In the alternative, upon information and belief, in the course of the business transaction between Packrite and GPI relating to the Clorox Business, GPI, through, at least, its representatives Tom Fester, Chris Berndt and/or Jeb Pfeifle, communicated false information and assurances to Packrite in regard to GPI's offering of Packrite the long-term Beer Carton Contract.

90. Upon information and belief, the representations and assurances made and given by GPI to Packrite in regard to the long-term Beer Carton Contract were intended to induce Packrite to assist GPI in connection with the Clorox Business. In making such representations and in giving such assurances, GPI undertook and owed Packrite a duty of care to refrain from providing Packrite with materially false information regarding the same.

91. Upon information and belief, the representations and assurances made and given by GPI to Packrite in regard to the long-term Beer Carton Contract were made by GPI without the exercise of reasonable care and/or diligence. Further, Packrite could not have, through the exercise of reasonable diligence, learned of the true facts relating to the prospects for the long-term Beer Carton Contract independently of the representations being made to it by GPI.

92. Packrite reasonably relied upon the representations of GPI in regard to the long-term Beer Carton Contract in agreeing to assist GPI in connection with the Clorox Business.

93. As a direct and proximate result of the representations of GPI as set forth hereinabove, Packrite has suffered significant actual damages, including special damages in the form of, at minimum, loss of corporate profit and loss of corporate business opportunities, in an

Case 1:17-cv-01019-LCB-LPA   Document 2   Filed 11/08/17   Page 17 of 19

amount in excess of $25,000.00, the exact amount of such damages to be proven in connection with this action.

### FIFTH CLAIM FOR RELIEF
(Unfair and Deceptive Trade Practices – N.C. Gen. Stat. §75-1.1)

94. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

95. GPI's wrongful and unlawful actions and conduct, as described above, constitute an unfair method of competition and an unfair or deceptive act or practice, in and affecting commerce, that has significantly injured, and will continue to injure, Packrite, thereby proximately causing, and continuing to proximately cause, damages to Packrite.

96. Accordingly, Packrite is entitled to recover from GPI such compensatory damages as it establishes at trial, to have those damages trebled pursuant to N.C. Gen. Stat. §75-1.1 and §75-16, and to recover its reasonable attorneys' fees pursuant to N.C. Gen. Stat. §75-16.1.

**WHEREFORE**, Plaintiff prays the Court grant the following relief:

1. That Packrite have and recover of the Defendant GPI damages based upon its breach of the Clorox Payment Agreement in an amount not less than $630,630.43 plus interest, costs and fees, the exact amount of such damages to be proven at the trial of this cause; and

2. That, in the alternative to the foregoing, the Packrite have and recover of the Defendant GPI, an amount not less than $630,630.43, plus all applicable interest, fees and costs, in *quantum meruit*; and

3. That, in addition to the foregoing damages, the Court enter its judgment in favor of the Plaintiff Packrite and against the Defendant GPI upon Plaintiff's Third, Fourth and/or Fifth Claims for Relief, and in doing so award Plaintiff additional compensatory and special damages, as described hereinabove, in an amount in excess of Twenty-Five Thousand Dollars

18

Case 1:17-cv-01019-LCB-LPA   Document 2   Filed 11/08/17   Page 18 of 19

($25,000.00), the exact amount of such compensatory and special damages to be established at the trial of this cause; and

4. That, in connection with Plaintiff Packrite's Fifth Claim for Relief, the Court treble the compensatory damages awarded in favor of the Plaintiff and against the Defendant, pursuant to N.C. Gen. Stat. §75-16; and

5. That, in the alternative to an award of treble damages pursuant to N.C. Gen. Stat. §75-16, the Court enter judgment in favor of the Plaintiff and against the Defendant, for such punitive damages as the Plaintiff establishes are just and appropriate under N.C. Gen. Stat. §1D-1 *et seq.* at the trial of this cause; and

6. That the Court award the Plaintiff it's reasonable attorney's fees, pursuant to N.C. Gen. Stat. §75-16.1, the agreements between the parties, and other applicable law; and

7. That the costs of this action be taxed against the Defendant; and

8. **THAT THE PLAINTIFF PACKRITE HAVE A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE**; and

9. That the Court grant such other and further relief as it deems just and proper.

Respectfully submitted, this the \_\_11\_\_ day of October, 2017.

_____
Christopher C. Finan, N.C.S.B. No. 27820
*Attorney for Plaintiff*

OF COUNSEL:

ROBERSON HAWORTH & REESE, P.L.L.C.
300 North Main Street, Suite 300
P.O. Box 1550
High Point, NC 27261
Telephone: (336) 889-8733
Facsimile: (336) 885-1280
Email: cfinan@rhrlaw.com

19