IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:17-cv-01019-LCB-LPA

PACKRITE, LLC,

                Plaintiff,

    v.

GRAPHIC PACKAGING
INTERNATIONAL, LLC,

                Defendant.

**SECOND AMENDED COMPLAINT**

**(Jury Trial Demanded)**

NOW COMES Plaintiff PACKRITE, LLC, by and through its undersigned counsel, complaining of the Defendant GRAPHIC PACKAGING INTERNATIONAL, LLC, and alleges the following[1]:

## PARTIES AND JURISDICTION

1.     PACKRITE, LLC (hereinafter the "**Plaintiff**" or "**Packrite**") is a limited liability company organized and existing under the laws of the State of North Carolina with its principal office and place of business in High Point, Guilford County, North Carolina.

2.     Upon information and belief, GRAPHIC PACKAGING INTERNATIONAL, LLC (hereinafter the "**Defendant**" or "**GPI**") is a corporation organized and existing under the laws of the State of Delaware with its principal office and place of business in Atlanta, Georgia.

3.     This Court has jurisdiction over the subject matter of this action and the parties hereto pursuant to 28 U.S.C. §1332(a), and venue is proper in this Court under 28 U.S.C. §1391(b).

---

[1] This Second Amended Complaint shall replace, in its entirety, the First Amended Complaint filed in this cause on October 15, 2018 (Doc. 24).

1

## FACTS

4.    Packrite is a specialized trade finisher for the corrugated and folding carton packaging industries. Packrite provides its specialized services within a wide range of industries, including without limitation pharmaceuticals, software, household products, and food and drink packaging.

5.    Upon information and belief, GPI is one of the world's largest manufacturers of folding cartons, unbleached paperboard, and coated recycled board used in packaging for the food, beverage, and consumer product industries.

6.    In or around 2012, a senior member of GPI's management team named Tom Fester contacted Packrite to engage Packrite's services during a time when certain GPI company-managed production facilities were experiencing production difficulties and were unable to fill certain GPI customer orders. At that time, GPI requested Packrite's assistance with production issues related to GPI's production facility in Solon, Ohio (the "**Solon Facility**").

7.    Among other things, as a result of significant production problems at the Solon Facility, GPI specifically called on Packrite to produce a large volume of GPI customer orders that GPI was unable to produce and fill at its Solon Facility. Upon information and belief, GPI management internally referred to this matter involving the Solon Facility as "Project Phoenix."

8.    Thereafter, beginning in or around 2014, Packrite began working closely with the Solon Facility and GPI's management in furtherance of "Project Phoenix," among other projects, and began conducting regular business with GPI.

9.    In furtherance of "Project Phoenix," Packrite regularly ran production at its facilities that GPI was unable to run at its Solon Facility due to ongoing and pervasive production

2

difficulties at that location. Packrite regularly assisted GPI in meeting GPI's customer requirements for the timeliness and quality of the products it produced.

10. Upon information and belief, "Project Phoenix" was later abandoned by GPI.

11. In return for Packrite's significant assistance related to "Project Phoenix" and other projects, GPI directed orders to Packrite for the production of its customers' products, but early in the parties' business relationship never otherwise offered assurances of a long-term agreement under which GPI would direct any particular quantity of business to Packrite. Nonetheless, Packrite consistently and continuously used its best efforts to assist GPI in connection with "Project Phoenix" and its other business pursuits, all in good faith.

12. Upon information and belief, it has never been, and is not today, the typical business practice of GPI to enter into long-term contracts with its vendors. Instead, GPI invariably engages its vendors only on an "as-needed" basis through individual purchase orders. At all times prior to mid-2016, GPI and Packrite engaged in business on such terms.

13. From and after the start of their business relationship in 2012, Packrite reasonably believed that Packrite and GPI shared a business relationship of mutual trust, confidence, and cooperation, in all respects.

14. At all times relevant, Packrite consistently used its best efforts to assist GPI and reasonably relied on what it was told by GPI's management regarding all present and anticipated future business matters.

**The Clorox Business**

15. In approximately August 2016, Packrite was contacted by Tom Fester, Chris Berndt, and/or Jeb Pfeifle of GPI, urgently seeking Packrite's assistance in producing the

3

packaging for "Clorox Kitty Litter," which packaging, upon information and belief, GPI had contracted to produce at that time (the "**Clorox Business**").

16.     At that time, upon information and belief, GPI did not have the resources, equipment, or capacity to undertake the Clorox Business itself, but instead required the services of Packrite to do so.

17.     Upon information and belief, the Clorox Business was part of a very large contract obtained by GPI, and its successful production was essential to GPI's ability to perform under such contract. To that end, GPI specifically informed Packrite that the Clorox Business was part of a "major initiative" for GPI, and was thus a matter of great importance to the company.

18.     Accordingly, GPI, through Tom Fester, Chris Berndt, and/or Jeb Pfeifle, requested Packrite's assistance and production capacity in connection with the Clorox Business that GPI was required to fulfill under, upon information and belief, the terms and conditions of its large contract with the Clorox Company.

19.     Specifically, GPI, through Tom Fester, Chris Berndt, and/or Jeb Pfeifle, requested that Packrite commit a significant amount of resources, as well as a large amount of its overall weekly production capacity, to the fulfillment of GPI's contractual obligations related to the Clorox Business, as GPI lacked the equipment and/or capacity to produce the required products itself at that time.

20.     GPI specifically requested that Packrite temporarily meet GPI's urgent needs in connection with the Clorox Business for a period of time sufficient to allow its Solon Facility to upgrade and install new equipment required to produce the Clorox Business. Particularly, the Solon Facility was installing a new "cutter" and a new "folder / gluer," which installation would not be completed until sometime in 2017. Additionally, Packrite was informed that the Solon

Facility was generally overbooked, and thus lacked sufficient capacity to fulfill GPI's urgent production needs in connection with the Clorox Business.

21.     At the time of GPI's request of Packrite in connection with the Clorox Business in mid-2016, Packrite itself lacked sufficient manpower, capacity, and all of the equipment necessary to fulfill GPI's needs.

22.     Although Packrite had the ability to "ramp up" production relating to the Clorox Business much more rapidly than would have been possible at the Solon Facility – a fact GPI was fully aware of at this time – doing so would require Packrite to expend significant resources, including without limitation the addition of employees, expensive equipment, and the dedication of a significant amount of time and effort.

23.     Further, because GPI had requested that Packrite dedicate a very significant amount of its production capacity to the Clorox Business to assist GPI in fulfilling its urgent need, in undertaking to do so Packrite would necessarily be unable to seek or obtain additional business from other sources because of its own finite amount of production capacity. If Packrite accepted GPI's request – made in connection with its "major initiative" relating to the Clorox Business – Packrite's capacity to seek out and/or undertake work unrelated to GPI would be extremely limited.

24.     Additionally, both GPI and Packrite knew and understood that accepting the Clorox Business would not constitute a long-term opportunity for Packrite.  Rather, at all times the parties knew and understood that Packrite would merely serve as a "stopgap" to meet GPI's immediate needs while the equipment necessary for GPI itself to produce the Clorox Business was installed at its Solon Facility.

25.     Accordingly, as Packrite's undertaking to assist GPI in connection with the Clorox Business would represent a major dedication of Packrite's time, effort, and money to what all

5

parties knew and understood would be a short-term project, Packrite was initially unwilling to assist GPI in connection with its onboarding of the Clorox Business.

**The Beer Carton Contract**

26.     After Packrite expressed its initial concerns and unwillingness to agree to assist GPI in connection with its onboarding of the Clorox Business, GPI raised a new matter in an attempt to induce Packrite to assist GPI in connection with the Clorox Business—the offer of a long-term contract under which Packrite would produce GPI's requirements of certain "roll to roll 18/12 MillerCoors cartons" (the "**Beer Cartons**").

27.     Specifically, in or around August 2016, Chris Berndt, GPI's Director of Operations, engaged in discussions with Packrite in which he specifically stated that, should Packrite agree to assist GPI in connection with the Clorox Business, and invest the capital and time required to do so to the detriment of Packrite's other business prospects, GPI would then agree to enter into a three (3) year contract with Packrite under which Packrite would be the sole producer of GPI's requirements of Beer Cartons (the "**Beer Carton Contract**").

28.     In so offering, upon information and belief, GPI, by and through Chris Berndt, knew and understood that Packrite would use the same or similar equipment, staffing, and processes to produce the Beer Cartons that would be needed to produce the Clorox Business if Packrite elected to assist GPI in that regard. As such, when Packrite's work on the Clorox Business was transitioned to the Solon Facility in mid-2017, as all parties contemplated from the outset, Packrite would be able to recover its investments made in conjunction with the Clorox Business in the production of Beer Cartons under the terms and conditions of the long-term Beer Carton Contract.

6

29.     GPI intended that its offer to enter into the Beer Carton Contract would induce Packrite to assist GPI in fulfilling its immediate needs in connection with the Clorox Business. GPI did so through this offer by providing Packrite with an incentive to make the significant investment of capital, time, and effort necessary to satisfy GPI's immediate needs.

30.     Specifically, upon information and belief, GPI knew and understood that the prospect of the Beer Carton Contract provided Packrite with the incentive necessary to undertake what it was initially unwilling to do for a short-term project benefitting only GPI—expend the time, effort and capital necessary to assist GPI in connection with the Clorox Business, all while foregoing new opportunities to expand Packrite's other, separate business opportunities.

31.     To this end, in or around August 2016, GPI, through its Director of Operations, Chris Berndt, specifically and unequivocally represented to Packrite, through its representatives Michael Drummond and Kevin Brown, that the Beer Carton Contract would result in gross revenue of approximately $10,000,000.00 per year to Packrite over the course of its performance.

32.     Based solely upon the representations of GPI, through its Director of Operations, Chris Berndt, regarding the forthcoming Beer Carton Contract, Packrite agreed in late August 2016 to assist GPI in fulfilling its immediate needs related to the Clorox Business.

33.     Packrite reasonably believed at that time in August 2016 that, as GPI's Director of Operations, Chris Berndt had the requisite authority to commit GPI to the Beer Carton Contract.

34.     But for the assurances regarding the Beer Carton Contract given to Packrite by GPI, through its Director of Operations, Chris Berndt, Packrite would not have undertaken to assist GPI in connection with the Clorox Business.

35.     At the time of its agreement in late August 2016 to assist GPI, Packrite reasonably believed and relied in good faith upon the truth of GPI's representations regarding the forthcoming

7

Beer Carton Contract, and began taking steps, on an expedited basis, to make the capital and staffing investments necessary to assist GPI in connection with the Clorox Business.

36.     Further, as much of Packrite's capacity would be exhausted by its production of product for GPI in conjunction with the Clorox Business, Packrite began to significantly limit its efforts to locate and onboard new business separate and apart from GPI at that same time.

**Packrite's Production of the Clorox Business**

37.     Packrite's production assistance to GPI in regard to the Clorox Business was scheduled to begin in approximately November 2016 and was to run through approximately May or June 2017, after which time much of the production relating to the Clorox Business would be transitioned to GPI's Solon Facility.

38.     To prepare for production beginning in November, Packrite began planning and expending significant time, effort, and capital in early September 2016.

39.     At that time, in furtherance of the Clorox Business and in reliance on the assurances given by GPI (through Chris Berndt) regarding the forthcoming Beer Carton Contract, Packrite hired new staff, made capital investments to increase its overall production capacity, installed a new quality lab, developed new procedures to meet the unique needs of GPI in conjunction with the Clorox Business, and committed a significant number of hours of training of its workforce in an effort to assist GPI in making its "major initiative" a success.

40.     In approximately November 2016, Packrite began production of the Clorox Business.

41.     In connection with the Clorox Business, GPI issued numerous purchase orders to Packrite, Packrite produced the product ordered in conjunction with each purchase order, and then issued individual invoices to GPI to be paid for its work. GPI agreed to pay Packrite's invoices

8

issued in conjunction with the Clorox Business in a timely manner on "net-15" day terms (the **"Clorox Payment Agreement"**).

42. GPI employees regularly worked closely with Packrite, and Packrite's employees regularly worked closely with GPI, to ensure that the production of the Clorox Business was timely and of good quality.

43. At every stage of Packrite's production of the Clorox Business, GPI's representatives reviewed and approved the methods and processes used by Packrite, in all respects.

44. For example, GPI's representatives visited Packrite's facilities in High Point, North Carolina on a weekly basis between at least November 2016 and May 2017 to inspect the products being produced and the production methods being utilized by Packrite in connection with the Clorox Business.

45. In furtherance of Packrite's production of the Clorox Business, at all times relevant, Packrite purchased much of the raw material necessary to complete the same from one or more of GPI's affiliated paper mills.

**GPI "Confirms" August 2016 Promise of Beer Carton Contract**

46. In or around November 2016, shortly after Packrite had begun production of the Clorox Business, representatives of Packrite had a meeting with, among others, Kristopher Dover, GPI's Vice President of Operations, in Atlanta, Georgia regarding the specific details of the promised Beer Carton Contract. Mr. Dover was a senior executive of the "beverage side" of GPI's business.

47. During that meeting, Kristopher Dover told representatives of Packrite, including at least Michael Drummond, that Chris Berndt, did not actually have the requisite authority to commit GPI to the promised the Beer Carton Contract when he did so in August 2016.

Case 1:17-cv-01019-LCB-LPA   Document 69   Filed 07/21/20   Page 9 of 46

Additionally, Mr. Dover indicated to at least Michael Drummond during the same meeting that nobody in a position of authority from the "beverage side" of GPI's business – which did have the requisite authority in regard to the promised Beer Carton Contract – had yet agreed to such a commitment to Packrite.

48.     During this same meeting, however, Mr. Dover went on to specifically and unequivocally represent to representatives of Packrite, including at least Michael Drummond, that he himself, being on the "beverage side" of the business did have the authority to award the Beer Carton Contract to Packrite.  Further, Mr. Dover specifically stated that because GPI was pleased with the work Packrite had done thus far in connection with the Clorox Business, and as a result of the good relationship that the two companies shared, GPI would honor Mr. Berndt's original promise, and GPI would in fact enter into the Beer Carton Contract with Packrite on the same terms promised in August 2016.

49.     Based on Mr. Dover's immediate reassurance of both his authority to bind GPI and his adoption, on behalf of GPI, of Mr. Berndt's promise, at all times throughout Packrite's production of the Clorox Business – until approximately May 2017 – GPI thus consistently and continuously assured Packrite that the formal, written Beer Carton Contract first promised in August 2016 was forthcoming.

50.     At no time prior to approximately May 2017 – when GPI was finally able to transition the production relating to the Clorox Business to its own Solon Facility – did GPI give Packrite any indication whatsoever that the Beer Carton Contract would not be forthcoming.

51.     To the contrary, the discussions and interactions between the parties from approximately August 2016 until approximately June 2017 – the exact date when GPI was finally able to transition production relating to the Clorox Business to its own Solon Facility – were

10

consistent with GPI's previous assurances that the long-term Beer Carton Contract was in process and would ultimately be awarded to Packrite.

52. However, GPI's discussions and interactions with Packrite between February 2017 and May 2017 regarding the Beer Carton Contract were instead specifically intended to mislead Packrite into continuing to reasonably believe that the promised Beer Carton Contract would be forthcoming. GPI intentionally misled Packrite in this regard for, among other reasons, to ensure that Packrite would continue to produce the Clorox Business until the same could be transitioned elsewhere.

53. To that end, GPI engaged in negotiations with Packrite regarding the specifics and details of the Beer Carton Contract from mid-January 2017 through approximately May 2017. Unbeknownst to Packrite, however, during this time GPI had no intention of ever entering the formal, written Beer Carton Contract with Packrite, and participated in these negotiations as a mere pretext, designed to ensure that Packrite continued to produce the Clorox Business for GPI until GPI could transition that production to its Solon Facility in or around May 2017.

54. That GPI had no intention of awarding the Beer Carton Contract to Packrite, but instead used that promise as a pretext to ensure Packrite's continued production of the Clorox Business through May 2017, is evidenced in part by GPI's conduct during these negotiations. For example, in January 2017 GPI sent Packrite what was purported to be a proposed written draft of the promised three-year Beer Carton Contract, showing as its term January 1, 2017 through December 31, 2019. A true and accurate copy of the document sent to Packrite by GPI is attached hereto as **Exhibit A** and is incorporated herein by reference.

55. The purported proposed draft agreement sent by GPI, however, was functionally an illusory contract that entirely omitted critical terms related to quantity (Appendix B) and price

11

(Appendix C). As a result, although GPI presented the proposed written draft as an offer that could be accepted by Packrite, no enforceable contract would have resulted from Packrite's acceptance of GPI's illusory offer.

56.     Upon review of GPI's proposed written draft, Packrite made certain proposed revisions to that document and returned the same to GPI for the insertion of quantity and price terms. A true and accurate of the draft Beer Carton Contract containing Packrite's proposed revisions is attached hereto as **Exhibit B** and is incorporated herein by reference.

57.     Thereafter, Packrite received no further specific response from GPI regarding either its proposed changes to the draft Beer Carton Contract or the omitted quantity and price terms, although the parties continued discussions and negotiations relating to the same through approximately May 2017. Packrite, through at least Kevin Brown, made numerous and continuous attempts to ascertain the status of the written Beer Carton Contract, however all of his inquires went substantively unanswered.

58.     During this time, representatives of GPI were specifically instructed by GPI's management to "stall" Packrite on the finalization of the Beer Carton Contract, all in a highly-coordinated and planned effort to conceal GPI's true intent regarding the same.

59.     GPI's subterfuge in prolonging these "negotiations" indeed had the desired effect—during this same time period, from early 2017 through May 2017, Packrite continued to work diligently in production of the Clorox Business in reliance on the continued assurances given by GPI regarding the promised Beer Carton Contract.

60.     Packrite also took numerous, concrete steps in reliance on the promised Beer Carton Contract including, without limitation, the expenditure of a significant amount of time, effort and money on a successful completion of a trial run (or "PTP" run) of Beer Cartons in Golden,

12

Colorado. At all times, Packrite continued to take these actions and to forego other significant and definite opportunities to grow its business with other unrelated parties, in reliance upon the continued assurances given by GPI that the Beer Carton Contract would be forthcoming and would be entered into by and between GPI and Packrite, as had been initially represented in or around August 2016.

61.     In an attempt to directly address the issues regarding the promised Beer Carton Contract with GPI, by emailed letter of May 26, 2017, Kevin Brown of Packrite specifically detailed all of the foregoing directly to Kristopher Dover of GPI.  A true and accurate copy of this letter is attached hereto as **Exhibit C** and is incorporated herein by reference.

62.     Neither Kevin Brown, nor anyone at Packrite, ever received any substantive or satisfactory response to the matters addressed in the correspondence attached hereto as Exhibit C. However, by the time of the sending of the foregoing letter, upon information and belief, the Solon Facility was up and running, such that GPI no longer needed Packrite's assistance.

**GPI Raises "Quality Issues" in May 2017**

63.     All actions taken and all work performed by Packrite in regard to the Clorox Business from and after August 2016 were taken and performed in specific reliance on the continuous and repeated assurances given by GPI to Packrite that the parties would enter into the Beer Carton Contract.

64.     However, in early May 2017 – at or immediately prior to the time the work on the Solon Facility was completed, and the Clorox Business was being transitioned from Packrite to GPI's own location – GPI informed Packrite for the very first time of purported "quality claims" regarding work Packrite had performed in connection with the Clorox Business, and of its intent

Case 1:17-cv-01019-LCB-LPA   Document 69   Filed 07/21/20   Page 13 of 46

to pursue a claim based on work Packrite had previously performed for GPI as far back as 2015 on certain Church & Dwight Co. products.

65.     To account for these "quality claims," such that there would be sufficient outstanding invoices due and owing to Packrite to "set off" against at the termination of their relationship – which GPI, but not Packrite, knew was forthcoming – GPI unilaterally changed, and significantly extended the payment terms for Packrite's invoices relating to the Clorox Business.

66.     In respect to these "quality claims," GPI made two primary assertions: (1) that the "glue pattern" on the handles of certain boxes produced by Packrite was out of specification; and (2) that certain of the products produced were experiencing "ply bond separation" resulting in a defective product being produced.

67.     Both of the purported "quality claims" asserted by GPI against Packrite are meritless.

68.     In regard to the "glue pattern" claim, GPI's employees specifically examined and pre-approved the "glue pattern" utilized by Packrite in conjunction with its production of the boxes in question.

69.     In regard to the "ply bond separation" claim asserted by GPI, the root cause of the same was not Packrite's production, but rather was determined to be defective "roll stock" produced by GPI's paper mill.

70.     Upon information and belief, the purported "quality claims" were wrongfully and maliciously contrived by GPI as part of a "Packrite Exit Plan" to avoid undertaking further business with Packrite, and specifically to avoid liability for GPI's promise to enter into the long-term Beer Carton Contract with Packrite in conjunction with Packrite's agreement to assist GPI

14

with the Clorox Business—a promise that GPI had not intended to fulfill since approximately February, 2017, if ever.

71.     Notwithstanding the contrived "quality claims" asserted by GPI, Packrite continued to perform work on the Clorox Business based on GPI's specific assurance that it would make full payment of all amounts due and owing to Packrite under the Clorox Payment Agreement.

72.     On the basis of these spurious "quality claims," however, GPI has wrongfully failed and refused to pay certain of Packrite's invoices pursuant to the Clorox Payment Agreement, such invoices currently totaling no less than the principal amount of $630,630.43.

73.     As of the present date, GPI has not entered into the Beer Carton Contract with Packrite.

74.     GPI has wrongfully failed and refused to enter into the Beer Carton Contract with Packrite, contrary to its specific and repeated representations that it would do so.

75.     From and after approximately mid-February, 2017, GPI never intended to enter into the Beer Carton Contract with Packrite.

76.     As a direct and proximate result of the fact that GPI has wrongfully failed and refused to enter into the Beer Carton Contract with Packrite, and further failed to act reasonably and in good faith to inform Packrite of its intent at any time in 2017 – instead electing to develop and carry out a coordinated plan to actively conceal and misrepresent to Packrite its true intentions, Packrite has suffered significant and calculable damage, including loss of profit and loss of alternative business opportunities.

### FIRST CLAIM FOR RELIEF
(Breach of Contract – Clorox Payment Agreement)

77.     The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

15

78.     The facts and circumstances described hereinabove constitute a breach of contract for which Defendant GPI is liable to Packrite in an amount not less than the total amount of the outstanding invoices due to Packrite under the Clorox Payment Agreement, the total principal amount of which is presently no less than $630,630.43.

79.     The facts and circumstances attendant to GPI's breach of contract, as set forth above, evidence a breach of GPI's duty of good faith and fair dealing with Packrite regarding the same.

80.     Based upon GPI's breach of the Clorox Payment Agreement, GPI is liable to Packrite in an amount not less than $630,630.43, plus interest, costs and fees.

## SECOND CLAIM FOR RELIEF – ALTERNATIVE
### (*Quantum Meruit*)

81.     The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

82.     In the alternative to Packrite's First Claim for Relief, Packrite delivered certain goods to the Defendant GPI, such goods having a value not less than $630,630.43.

83.     The Defendant has failed and refused to pay for all goods sold and delivered, such goods having a value not less than $630,630.43.

84.     The goods provided by Packrite to GPI had substantial value to GPI.

85.     The goods provided by Packrite to GPI were timely delivered and, upon information and belief, retained by GPI.

86.     The goods provided by Packrite to GPI conformed in all respects to the applicable standards of quality.

87.     At the time Packrite provided goods to GPI, Packrite reasonably expected to be paid for such goods.  The delivery of said goods to GPI by Packrite was not gratuitous.

16

88.     GPI freely and voluntarily accepted the benefits of the delivery of goods by Packrite with the knowledge that Packrite expected to be paid for the provision of such goods.

89.     Accordingly, in the alternative to Packrite's First Claim for Relief, Packrite is entitled to payment from GPI, in *quantum meruit*, in an amount not less than the total amount of $630,630.43, plus interest, costs and fees.

### THIRD CLAIM FOR RELIEF
(Fraudulent Omission)

90.     The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

91.     By February 2017, GPI internally decided not to enter into the Beer Carton Contract with Packrite—contrary to its initial representations to Packrite that GPI knew had induced Packrite to assist with the Clorox Business in the first instance.

92.     As early as January of 2017, GPI began seriously considering options to move the production of products currently located at Packrite to alternative facilities. On January 27, 2017, GPI employee, Tom Fester, relayed in an email to several other GPI employees that the Flutes manufacturing facility ("Flutes") has placed an order for a new Bobst Masterflute Asitrade: a similar machine to what Packrite used in conjunction with its work in the Clorox Business and in the production of Beer Cartons. In his email, Tom Fester stated "Flutes has been a very good partner of GPI/Solon for a number of years and this seemingly can't come at a better time for us based on *our current Packrite situation.*"

93.     Upon information and belief, by the end of February 2017, GPI had internally decided that it would no longer utilize Packrite's facility for its upcoming Beer Carton production. On February 24, 2017, GPI employee, William Sedlacek, following a weekly conference call between other GPI employees, provided an "executive update" summary of the meeting to Tom

17

Fester and Chuck Tarlton of GPI stating "[]*lengthy discussion around Packrite today: Nobody trusts them, but no real alternative, yet. Pacing the move to Flutes to avoid antagonizing Packrite until we are in better place*."

94.     On March 29, 2017, Terry Stratton and Allen Ennis of GPI were tasked with developing a strategy to move the MillerCoors 18/12 beer carton production out of Packrite and back to GPI's Solon facility. This strategy was fully developed by April 20, 2017, and referred to internally at GPI as the "Packrite Exit Plan" or the "Exit Plan at Packrite to limit exposure and recover equipment."

95.     In its April 20, 2017 "Packrite Exit Plan" GPI listed the *"[n]eed to keep project secret from Packrite"* as being critical to their success and specifically identified tactics of practicing confidentiality, limiting involvement, and filing quality claims with Packrite closer to the exit date as ways to mitigate the risk that "*Packrite gets word early of our intent to move to Flutes*."

96.     Thus, because of its ongoing needs in conjunction with the Clorox Business, GPI representatives (specifically including at least Kristopher Dover, Ryan Ingalls, and Tom Fester) did not inform Packrite that GPI had made the decision not to enter into the Beer Carton Contract, and instead deliberately continued to provide Packrite with what they knew to be false assurances that the Beer Carton Contract was forthcoming, and would be honored by GPI, in order to ensure that Packrite would continue production of the Clorox Business and forego other business opportunities that, if pursued, would have diverted Packrite's resources from the continued production of the Clorox Business.

97.     On March 10, 2017, when asked by Joe Yost as to whether GPI should continue to have Packrite undergo further "18/12 trials", Kristopher Dover responded "*I think we should go

18

*ahead with the trial. It qualifies the source and keeps the Packrite guys engaged until we are done with them.*" (emphasis added). Despite repeated requests for clarification on the status of the promised "Beer Carton Contract" from Packrite, GPI continued to ignore these requests or delay providing a definitive written response. Ryan Ingalls confirmed in an April 3, 2017 email to Kristopher Dover that he was under the specific "*directive to stall Packrite on the contract.*"

98.     At no point after determining it would no longer enter into the Beer Carton Contract with Packrite did GPI inform Packrite of this decision until late June of 2017, a time after Packrite had finished assisting GPI with the Clorox Business production and not until GPI had the capacity to immediately host Beer Carton production at the Solon and Flutes facilities.

99.     The continued representations and assurances of the forthcoming Beer Carton Contract made and given by GPI to Packrite after such time as GPI had made the decision not to proceed with the same, were knowingly false and wrongful when made solely in an effort to induce Packrite not to abandon its continued efforts upon the Clorox Business, as GPI required Packrite's assistance with the same through approximately May 2017.

100.    GPI's continued representations and assurances of the forthcoming Beer Carton Contract, and GPI's intentional failure to inform Packrite that GPI had already decided not to enter into the promised Beer Carton Contract, as set forth hereinabove, were reasonably calculated and intended by GPI to deceive Packrite by, at least, inducing it to continue to assist GPI in connection with its production of the Clorox Business.

101.    GPI's continued representations and assurances of the forthcoming Beer Carton Contract, and GPI's intentional failure to inform Packrite that GPI had already decided not to enter into the promised Beer Carton Contract, as set forth hereinabove, did in fact deceive Packrite.

19

102.    Packrite's reliance on the representations and omissions by GPI was reasonable in that Packrite could not have known through reasonable diligence that GPI did not intend to enter into the Beer Carton Contract because GPI, through and under the direction of Kristopher Dover and Ryan Ingalls, deliberately concealed this information from Packrite through May, 2017 by misrepresenting the status of the Beer Carton Contract's drafting and by continuing to require Packrite to participate in qualification trials, which was known to GPI to be part of Packrite's understanding of the overall plan for the 18/12 beer carton production.  Further, GPI deliberately withheld from Packrite its pursuit of offsets on Packrite's invoices relating to the purported "quality claims" for several months for the specific purpose of avoiding alerting Packrite of GPI's intent not to award the 18/12 beer carton production to Packrite, but rather to continue to induce Packrite to perform work on the Clorox Business.

103.    During this time, GPI had a duty, at minimum, not to misrepresent to Packrite its intentions regarding the Beer Carton Contract upon specific and repeated inquiry by Packrite regarding the same and to disclose the fact that it did not intend to enter into the beer carton contract with Packrite as was previously understood by the parties.

104.    As a direct and proximate result of the specific material omissions of GPI as set forth hereinabove, Packrite acted reasonably in not soliciting significant additional business for its facility for remainder of 2017 and 2018, on the basis that its capacity would be largely filled with the beer carton production pursuant to the Beer Carton Contract with GPI. As such, Packrite has suffered significant actual damages, including special damages relating to, at minimum, loss of corporate profit and loss of corporate business opportunities, in an amount in excess of $25,000.00, the exact amount of such damages to be proven in connection with this action.

20

105.    Additionally, pursuant to the provisions of Chapter 1D of the North Carolina
General Statutes, the actions and material omissions of the Defendant GPI, as alleged herein, were
willful, wanton and fraudulent, thereby entitling Packrite to an award of punitive damages.

## FOURTH CLAIM FOR RELIEF
(Unfair and Deceptive Trade Practices – N.C. GEN. STAT. §75-1.1)

106.    The allegations contained in the preceding paragraphs of this Complaint are
incorporated herein by reference.

107.    GPI's wrongful and unlawful actions and conduct, as described above, constitute
an unfair method of competition and an unfair or deceptive act or practice, in and affecting
commerce, that has significantly injured, and will continue to injure, Packrite, thereby proximately
causing, and continuing to proximately cause, damages to Packrite.

108.    Accordingly, Packrite is entitled to recover from GPI such compensatory damages
as it establishes at trial, to have those damages trebled pursuant to N.C. GEN. STAT. §75-1.1 and
§75-16, and to recover its reasonable attorneys' fees pursuant to N.C. GEN. STAT. §75-16.1.

**WHEREFORE**, Plaintiff prays the Court grant the following relief:

1.    That Packrite have and recover of the Defendant GPI damages based upon its
breach of the Clorox Payment Agreement in an amount not less than $630,630.43 plus interest,
costs and fees, the exact amount of such damages to be proven at the trial of this cause; and

2.    That, in the alternative to the foregoing, the Packrite have and recover of the
Defendant GPI, an amount not less than $630,630.43, plus all applicable interest, fees and costs,
in *quantum meruit*; and

3.    That, in addition to the foregoing damages, the Court enter its judgment in favor of
the Plaintiff Packrite and against the Defendant GPI upon Plaintiff's Third and/or Fourth Claims
for Relief, and in doing so award Plaintiff additional compensatory and special damages, as

21

described hereinabove, in an amount in excess of Twenty-Five Thousand Dollars ($25,000.00), the exact amount of such compensatory and special damages to be established at the trial of this cause; and

4.     That, in connection with Plaintiff Packrite's Fourth Claim for Relief, the Court treble the compensatory damages awarded in favor of the Plaintiff and against the Defendant, pursuant to N.C. GEN. STAT. §75-16; and

5.     That, in the alternative to an award of treble damages pursuant to N.C. GEN. STAT. §75-16, the Court enter judgment in favor of the Plaintiff and against the Defendant, for such punitive damages as the Plaintiff establishes are just and appropriate under N.C. GEN. STAT. §1D-1 *et seq.* at the trial of this cause; and

6.     That the Court award the Plaintiff it's reasonable attorney's fees, pursuant to N.C. GEN. STAT. §75-16.1, the agreements between the parties, and other applicable law; and

7.     That the costs of this action be taxed against the Defendant; and

8.     **THAT THE PLAINTIFF PACKRITE HAVE A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE**; and

9.     That the Court grant such other and further relief as it deems just and proper.


Respectfully submitted, this the 21st day of July, 2020.


                                        /s/ Christopher C. Finan
                                        Christopher C. Finan, N.C.S.B. No. 27820
                                        *Attorney for Plaintiff Packrite, LLC*

22

<u>OF COUNSEL:</u>

ROBERSON HAWORTH & REESE, P.L.L.C.
300 North Main Street, Suite 300
P.O. Box 1550
High Point, NC  27261
Telephone:  (336) 889-8733
Facsimile:  (336) 885-1280
Email:     cfinan@rhrlaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:17-cv-01019-LCB-LPA

| | |
|---|---|
| PACKRITE, LLC,<br><br>     Plaintiff,<br><br> v.<br><br>GRAPHIC PACKAGING<br>INTERNATIONAL, INC.,<br><br>     Defendant. | **<u>CERTIFICATE OF SERVICE</u>** |

   This is to certify that the undersigned counsel has this date electronically filed the foregoing **Second Amended Complaint** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record that have made an appearance in this case.

 Lex M. Erwin
 Joseph W. Moss, Jr.
 Matthew M. Holtgrewe
 Erwin Bishop Capitano & Moss, PA
 4521 Sharon Road, Suite 350
 Charlotte, NC  28211

   This the 21st day of July, 2020.


         <u>/s/ Christopher C. Finan</u>
         Christopher C. Finan, N.C.S.B. No. 27820
         *Attorney for Plaintiff*


<u>OF COUNSEL</u>:

ROBERSON HAWORTH & REESE, PLLC
300 N. Main Street, Suite 300
P. O. Box 1550
High Point, NC  27261
Telephone:  336-889-8733
Facsimile:  336-885-1280
Email:  cfinan@rhrlaw.com

1

## SUPPLY AND PURCHASE AGREEMENT

This SUPPLY AGREEMENT ("Agreement"), entered into as of this 1st day of January, 2017, between Graphic Packaging International, Inc., a Delaware corporation ("GPI"), and Packrite, LLC, a North Carolina limited liability company ("Packrite").

### W I T N E S S E T H :

WHEREAS, GPI and Packrite have entered into a business understanding regarding the sale by GPI to Packrite of certain packaging material ("Materials"); and

WHEREAS, Packrite and GPI have entered into a business understanding regarding the sale by Packrite to GPI of certain finished cartons ("Cartons"); and

WHEREAS, the covenants and agreements set forth in this Agreement are the components of the understandings between the parties.

NOW, THEREFORE, in consideration of the premises and the mutual promises and agreements set forth herein, the parties hereto agree as follows:

1.     <u>General Terms and Conditions</u>. Except to the extent they are inconsistent with the terms of this Agreement, GPI's standard terms and conditions with respect to the sale of goods, attached hereto as Appendix A, shall apply to any and all purchases made pursuant to this Agreement.

2.     <u>Supply of Goods</u>.

a.  <u>Materials</u>. Packrite hereby agrees to purchase its requirements of the Materials necessary for manufacturing Cartons, as set forth in Appendix B which may be amended from time to time, from GPI, and GPI hereby agrees to produce and sell to Packrite the Materials.

b.  <u>Cartons</u>. GPI hereby agrees to purchase its external requirements of Cartons, as set forth in Appendix C, which may be amended from time to time, from Packrite, and Packrite hereby agrees to produce and sell to GPI the Cartons.

c.  <u>Inability to Perform</u>. In the event either party is unable for any reason to perform its supply obligations hereunder then, during such period, the other party may procure Materials or Cartons (as applicable) from other sources, notwithstanding the fact that this Agreement has not yet been terminated, and may continue to do so until such time as the other party has regained its ability to so perform, unless this Agreement shall have been sooner terminated in accordance with its terms.

3.     <u>Specifications</u>. The specifications for the Materials and Cartons will be as



agreed to from time to time in writing by Packrite and GPI, but in any event will conform to the specifications reviewed and approved by Packrite, as set forth herein in Appendix B for Materials and Appendix C for Cartons.

4.    <u>Pricing</u>. The pricing for the Materials shall be as set forth in Appendix B. The pricing for Cartons shall be as set forth in Appendix C. Unless otherwise agreed to in writing by the Parties, any increase in the prices of Materials shall result in a corresponding proportionate increase in the prices of Cartons.

5.    <u>Shipping of Goods</u>.

a.    <u>Materials</u>. FCA Packrite's facility. Title to, and risk of loss of, any shipment of Materials sold pursuant to this Agreement shall pass to Packrite when delivered to the FCA location. All freight charges shall be paid by GPI. Unless otherwise agreed, the carrier shall be selected by GPI.

b.    <u>Cartons</u>. EX-Works Packrite's facility, loaded. Title to, and risk of loss of, any shipment of Cartons sold pursuant to this Agreement shall pass to GPI when loaded on the carrier at the EX-Works location. All freight charges shall be paid by GPI. Unless otherwise agreed, the carrier shall be selected by GPI.

6.    <u>Payment</u>. Unless otherwise agreed to in writing by the Parties, when Packrite is the seller, Seller's terms are Net 15 from the date of the invoice; when GPI is the seller, Seller's terms are Net 60 from the date of the invoice. Prices do not include sales, excise, use or other taxes in effect or hereafter levied by reason of this transaction.

7.    <u>Term and Termination</u>.

A.    The term of this Agreement shall begin January 1, 2017 and extend through December 31, 2019.

B.    If, at any time, either of the parties hereto shall become bankrupt, insolvent or make any assignment for the benefit of creditors, the other party shall have the option to terminate the Agreement forthwith.

C.    If either of the parties hereto shall fail to make any payment due hereunder, the other party shall have the right to terminate this Agreement by written notice to the defaulting party and said termination shall be effective on the thirtieth (30th) day after mailing of such notice, unless the defaulting party shall prior thereto have cured such payment default or breach. If either of the parties hereto shall cause or permit any non-monetary breach of this Agreement, the other party shall have the right to terminate this Agreement by written notice to the defaulting party and said termination shall be effective on the sixtieth (60th) day after mailing of such notice, unless the defaulting party shall prior thereto have cured such default or breach. However, if such non-monetary default takes more than sixty (60) days to cure, and the

defaulting party commences cure within thirty (30) days of notice, and diligently pursues cure until complete then such party shall not be deemed to be in default, provided such non-monetary default is cured within ninety (90) days of beginning of cure. Provided further, however, that the foregoing shall not apply to any non-monetary default which by its nature is not capable of being cured.

8. <u>Indemnification</u>

Each party shall indemnify, defend and hold the other harmless from and against any and all third party claims, suits, demands or proceedings for any loss, damage, costs, liability and expense (including reasonable attorney's fees), judgments and liabilities whatsoever, including without limitation any products liability claims, sustained or claimed to have been sustained by any individual, firm or corporation, arising out of, or in connection with any act or omission of the indemnifying party, its employees, agents, or subcontractors in the performance of this Agreement to the extent of their comparative negligence or fault, as determined by a court of competent jurisdiction; provided, however, that the indemnified party must provide prompt written notification of any such claim, that the indemnifying party has full control of the defense and negotiation of settlement and as part of the defense of any such claim (provided no settlement admitting liability or imposing obligations on a party can be agreed to without such party's written consent), and such party will, at the indemnifying party's cost, use all commercially reasonable efforts to provide such assistance as the indemnifying party may reasonably require from time to time. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE, OR OTHER INDIRECT DAMAGES.

9. <u>Notice</u>. Any notice, request, demand or other communication which either party hereto wishes to give to the other party shall be in writing, unless otherwise agreed to by the parties, and shall be deemed properly given when served by facsimile, or deposited with the appropriate postal service authorities for transmittal by registered mail, postage prepaid. Such communications shall be sent to the following addresses, or such other addresses as the parties from time-to-time may agree upon:

|  |  |
|---|---|
| If to GPI: | Graphic Packaging International, Inc. |
|  | 1500 Riveredge Parkway |
|  | Atlanta, GA  30328 |
|  | Attn.:  General Counsel |
|  | Facsimile:  770.644.2929 |
| If to Packrite: | Packrite, LLC |
|  | 1650 Packrite Court |
|  | High Point, NC  27260 |
|  | Attn.:  Michael Drummond |
|  | Facsimile:  336-884-1706 |

10.  <u>General</u>.

A.    This Agreement is not transferable or assignable by either party without the consent of the other, which shall not be unreasonably withheld, except that either party shall have the right without such consent to assign this Agreement to any of its parent, subsidiary or affiliated corporations or to any purchaser of all or substantially all of its assets.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

B.    This Agreement contains the entire understanding between Packrite and GPI for the purchase and sale of the goods described herein, and there are no warranties of any kind, either expressed or implied, other than expressly set forth herein.  This Agreement shall not be modified by acceptance by either party of any purchase order or confirmation issued by the other party and containing terms and conditions inconsistent herewith.

C.    If any term or provision of this Agreement should be declared invalid by a court having jurisdiction, the remaining terms and provisions hereof shall be unimpaired and the invalid term or provision shall be replaced by a clause which, becoming valid, comes closest to the intention underlying the invalid term or provision.

D.    Paragraph and subparagraph headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

E.    No failure or delay on the part of either party in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy hereunder precluded any other or further exercise of any other right, power or remedy hereunder.

F.    This Agreement shall be governed for all purposes by the laws of the State of Georgia.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first above written.

PACKRITE, LLC                              GRAPHIC PACKAGING
                                          INTERNATIONAL, INC.

By: _____        By: _____

Name: _____        Name: _____

Title:_____        Title _____

Date: _____        Date: _____

## APPENDIX A

GRAPHIC PACKAGING INTERNATIONAL, INC.
STANDARD TERMS AND CONDITIONS OF SALE FOR GOODS FROM THE UNITED STATES

1.  **Shipment.** Shipment will be made EX-Works loaded, for non-export transactions within the United States. For export sales, see Section 16.

2.  **Title.** Title to and risk of loss or damage of the material covered by this order shall pass to Buyer at the delivery point specified.

3.  **Taxes.** Prices do not include sales, excise, use or other taxes now in effect or hereafter levied by reason of this transaction. All taxes are for the account of Buyer.

4.  **Pricing.** Unless otherwise provided, all prices are subject to change upon 30 days written notice from Seller.

5.  **Payment.** Unless otherwise agreed to in writing by the Parties, Seller's terms are Net 30 from the date of the invoice. However, if Buyer's financial responsibility or condition reasonably appears to call for such action, Seller may require payment in advance or security so that invoices will be paid when due. If Buyer becomes insolvent, commits an act of bankruptcy, fails to make payment when due, or fails to comply with Seller's aforesaid requirements, Seller reserves the right to withhold further deliveries or to terminate this Agreement and any unpaid amount shall thereupon become due immediately. Interest will be charged on any overdue amounts at 18% (eighteen percent) per annum or, if less, the highest rate permitted by law. If Seller should find it necessary to retain a collection agency and/or attorney to collect amounts overdue, the collection costs, including attorney's fees, shall be payable by Buyer.

6.  **Warranty and Warranty Disclaimer.** Seller warrants that all materials sold pursuant hereto will conform to the description on the face of the quote attached hereto, subject to standard commercial tolerances, that such materials will be free from defects in materials and workmanship, and that it will convey good title hereto. The aforesaid warranties apply only to Buyer and are non-assignable. **Except as expressly set forth above, there is no warranty representation or condition of any kind, express or implied, including no warranty of merchantability or of fitness for particular purpose relating to such materials and none shall be implied by law.** As to the warranty expressly made above, any claim by Buyer on account of breach of warranty shall be deemed waived conclusively unless written notice thereof is given within ten days of Buyer's receipt of material and before use or alteration thereof. This warranty shall not apply to any material, which shall have been damaged in any way after shipment from Seller's plant or if the material is more than three months old. Seller shall have the right either to replace or repair any defective materials, to refund the purchase price or credit Buyer therewith, or with Buyer's concurrence, to grant a reasonable allowance on account of such defects, and Seller's liability and Buyer's exclusive remedy for defective materials shall be limited to replacement, repair, refund, credit or allowance as Seller may elect. Seller shall not be liable for any other loss or damages, direct, consequential, special or otherwise, occasioned by defects or deficiencies in the materials. Seller shall be given reasonable opportunity to investigate all claims and no materials shall be returned to Seller until receipt by Buyer of shipping instructions from Seller.

7.  **Manufacture.** All notices relating to this Agreement or orders placed pursuant hereto must be in writing and any change in specifications or other provisions must be consented to in writing by both Buyer and Seller. Buyer agrees to hold Seller harmless from any and all claims arising from words or other matter imprinted upon the material relating to the attached quote or orders placed pursuant thereto at Buyer's direction, notwithstanding that Seller may have been consulted thereon. In the event that any word or words, trademark or trade name, or graphic information or design is imprinted on the merchandise sold hereunder, Seller accepts no responsibility or liability for compliance thereof with the Fair Packaging and Labeling Act of 1966, as amended, or the regulations issued pursuant thereto.

8.  **Preparatory Work.** All prices are based on all preparatory materials (proofs, films, plates, cylinders and inserts) being furnished by the Buyer. In the event that Seller is called upon to either furnish the preparatory materials or to revise preparatory materials furnished by the Buyer, any charges incurred by Seller will be billed to the Buyer.

9.  **Quantity Tolerances.** Tolerances of ten (10) percent plus or minus will apply to the quantity of materials specified in any order made pursuant to the attached quote.

10. **Delays.** Seller shall not be liable for any failure in performance arising from strikes or other labor difficulties, labor shortage, fire, flood, war, breakdowns or failure of plant machinery or equipment, delays in or lack of transportation, Governmental priorities or allocations, delays of suppliers, or any other cause beyond the reasonable control of Seller. In the event of delay or failure of performance not excused in accordance with the preceding sentence, Seller's liability shall not exceed, and Buyer's exclusive remedy shall be limited to, the excess costs, if any, reasonably incurred by Buyer in procuring the undelivered portion of the material ordered from other sources. In no event shall Seller be liable for any consequential, special or contingent damages. No material will be held after the time designated for shipment, except by mutual consent, and except that Seller may delay shipments pending settlement of any overdue indebtedness under any order from Buyer to Seller. Delivery dates are approximate; delivery within a reasonable time of the dates specified herein shall be deemed full performance of the Seller's obligations under this contract.

11. **Inventory.** The Buyer is obligated to take delivery of all inventory within 90 days of production. If goods remain in inventory at the end of the 90-day period, cartons will be invoiced to Buyer. If the final shipment date for goods is not agreed upon by the Buyer and the Seller within 90 days of production, such goods will be warehoused at the Buyer's expense at a charge of 1.5% of invoiced value per month for up to 90 additional days. Prior to Seller agreeing to warehouse product beyond such 90-day period, Buyer is obligated to advise shipping date in writing. All promotional inventory is to be shipped prior to the out of market date. The Buyer will be notified of any promotional cartons remaining in inventory after expiration of the promotion and the Buyer is obligated to pay for such inventory.

12. **Assignability.** The rights of either party hereunder are not assignable and goods sold hereunder are not to be shipped or delivered to any destination other than that herein specified, without consent of Seller; provided, however, that either party may assign its rights and responsibilities hereunder to the buyer of all or substantially all of its assets or stock.

13. **Buyer Warranty and Indemnification.** Buyer warrants that any design or other matter lithographed or printed at the Buyer's request on any merchandise furnished hereunder will not infringe any trademark, copyright or other property right of another. Buyer shall indemnify, defend, protect and hold harmless Seller, its employees, agents, servants, successors and assigns from all costs, expenses (including reasonable attorneys' fees), damages or claims arising out of infringement or claim of infringement of any patent rights, trademark, tradename or copyright based on the sale, purchase or use of any design or other matter lithographed or printed at Buyer's request on any merchandise furnished hereunder.

14. **Limitation of Liability.** Neither party shall be liable to the other for any consequential, special, indirect, or punitive damages under this Agreement.

15. **Miscellaneous.**
    (a) These standard terms and conditions shall supersede all other representations and statements, verbal or written, relating to goods specified herein unless the sale of such goods is subject to a written contract, signed by the Seller and the Buyer, in which case any terms therein which differ from or conflict with the standard terms and conditions set forth herein shall control. Brokers and salesmen have no authority to waive charges or add to any of the terms or conditions. These standard terms and conditions may be modified only by an agreement in writing signed by the authorized representatives of both parties.
    (b) The waiver of any term, condition, or provision, hereof shall not be construed to be a waiver of any other term, condition, or provision hereof, nor shall such waiver be deemed a waiver of a subsequent breach of the same term condition or provision.
    (c) The sale of goods subject to these standard terms and conditions shall be governed by the laws of the State of Georgia.
    (d) This Order may not be cancelled or modified, in whole or in part by the Buyer after acceptance by Seller, except upon Seller's written consent.

16. **Provisions Applicable to Sales for Export Only.**
    (a) For sales between the U.S. and Canada, all shipments shall be shipped DDU Buyer's location (Incoterms 2000) unless otherwise agreed by the parties. Title and risk of loss shall pass at the DDP point.
    (b) For sales from the U.S. to Mexico, shipments shall be shipped DAF designated border point (Incoterms 2000), unless otherwise agreed by the parties. Title and risk of loss shall pass at the DAF point.
    (c) For sales from the U.S. or Canada to any other countries, shipments shall be shipped FCA named point of departure (Incoterms 2000), unless otherwise agreed by the parties.
    (d) The selling price in an export order where Seller is required to pay customs, tax and/or duties is based on Seller paying present rate duty, tax and/or customs on present valuation at port of shipment. Any change in rate or advance or decline in value necessitating a change in the amount of U.S. duty, tax, and/or customs is for the account of the Buyer.
    (e) The price set forth in the attached pricing or quote is payable in U.S. Dollars unless otherwise specified therein.

6

(f) Neither the Convention relating to a uniform law on the International Sale of Goods 1964 nor the United Nations Convention on Contracts for the International Sale of Goods 1980 will apply to this Agreement.

(g) Unless the provisions of this section require the contrary, all applicable provisions of these Terms and Conditions of Sale shall apply to export sales.

# APPENDIX B
## Pricing and Specifications for Materials

8

## APPENDIX C
### Pricing and Specifications for Cartons

9

## SUPPLY AND PURCHASE AGREEMENT

This SUPPLY AGREEMENT ("Agreement"), entered into as of this 1st day of January, 2017, between Graphic Packaging International, Inc., a Delaware corporation ("GPI"), and Packrite, LLC, a _____ corporation North Carolina limited liability company ("Packrite").

### WITNESSETH:

WHEREAS, GPI and Packrite have entered into a business understanding regarding the sale by GPI to Packrite of certain packaging material ("Materials"); and

WHEREAS, Packrite and GPI have entered into a business understanding regarding the sale by Packrite to GPI of certain finished cartons ("Cartons"); and

WHEREAS, the covenants and agreements set forth in this Agreement are the components of the understandings between the parties.

NOW, THEREFORE, in consideration of the premises and the mutual promises and agreements set forth herein, the parties hereto agree as follows:

1.     <u>General Terms and Conditions</u>. Except to the extent they are inconsistent with the terms of this Agreement, GPI's standard terms and conditions with respect to the sale of goods, attached hereto as Appendix A, shall apply to <u>any and all</u> purchases made pursuant to this Agreement.

2.     <u>Supply of Goods</u>.

a.   <u>Materials</u>. Packrite hereby agrees to purchase its requirements of the Materials necessary for manufacturing Cartons, as set forth in Appendix B which may be amended from time to time, from GPI, and GPI hereby agrees to produce and sell to Packrite the Materials.

b.   <u>Cartons</u>. GPI hereby agrees to purchase its external requirements of Cartons, as set forth in Appendix C, which may be amended from time to time, from Packrite, and Packrite hereby agrees to produce and sell to GPI the Cartons.

c.   <u>Inability to Perform. In the event either party is unable for any reason to perform its supply obligations hereunder then, during such period, the other party may procure Materials or Cartons (as applicable) from other sources, notwithstanding the fact that this Agreement has not yet been terminated and may continue to do so until such time as the other party has regained its ability to so perform, unless this Agreement shall have been sooner terminated in accordance with its terms.</u>

ALL-STATE LEGAL®

**EXHIBIT**

**B**

3.    Specifications. The specifications for the Materials and Cartons will be as agreed to from time to time in writing by Packrite and GPI, but in any event will conform to the specifications reviewed and approved by Packrite, as set forth herein in Appendix B for Materials and Appendix C for Cartons.

4.    Pricing.  The pricing for the Materials shall be as set forth in Appendix B. The pricing for Cartons shall be as set forth in Appendix C.  Unless otherwise agreed to in writing by the Parties, any increase in the prices of Materials shall result in a corresponding proportionate increase in the prices of Cartons.

5.    Shipping of Goods.

a.  Materials.  FCA Packrite's facility.  Title to, and risk of loss of, any shipment of Materials sold pursuant to this Agreement shall pass to Packrite when delivered to the FCA location.  All freight charges shall be paid by GPI. Unless otherwise agreed, the carrier shall be selected by GPI.

b.  Cartons.  EX-Works Packrite's facility, loaded.  Title to, and risk of loss of, any shipment of Cartons sold pursuant to this Agreement shall pass to GPI when delivered to loaded on the carrier at the EX-Works location.  All freight charges shall be paid by GPI.  Unless otherwise agreed, the carrier shall be selected by GPI.

6.    Payment.  Payment terms are net 30 days. Unless otherwise agreed to in writing by the Parties, when Packrite is the seller, Seller's terms are Net 15 from the date of the invoice; when GPI is the seller, Seller's terms are Net 60 from the date of the invoice.  Prices do not include sales, excise, use or other taxes in effect or hereafter levied by reason of this transaction.

7.    Term and Termination.

A.    The term of this Agreement shall begin January 1, 2017 and extend through December 31, 2019.

B.    If, at any time, either of the parties hereto shall become bankrupt, insolvent or make any assignment for the benefit of creditors, the other party shall have the option to terminate the Agreement forthwith.

C.    If either of the parties hereto shall cause or permit any fail to make any payment due hereunder, the other party shall have the right to terminate this Agreement by written notice to the defaulting party and said termination shall be effective on the thirtieth (30th) day after mailing of such notice, unless the defaulting party shall prior thereto have cured such payment default or breach.  If either of the parties hereto shall cause or permit any non-monetary breach of this Agreement, the other party shall have the right to terminate this Agreement by written notice to the defaulting party and said

termination shall be effective on the sixtieth (60th) day after mailing of such notice, unless the defaulting party shall prior thereto have cured such default or breach. However, if such non-monetary default takes more than sixty (60) days to cure, and the defaulting party commences cure within thirty (30) days of notice, and diligently pursues cure until complete then such party shall not be deemed to be in default, provided such non-monetary default is cured within ninety (90) days of beginning of cure. Provided further, however, that the foregoing shall not apply to any non-monetary default which by its nature is not capable of being cured.

8. Indemnification

Each party shall indemnify, defend and hold the other harmless from and against any and all third party claims, suits, demands or proceedings for any loss, damage, costs, liability and expense (including reasonable attorney's fees), judgments and liabilities whatsoever, including without limitation any products liability claims, sustained or claimed to have been sustained by any individual, firm or corporation, arising out of, or in connection with any act or omission of the indemnifying party, its employees, agents, or subcontractors in the performance of this Agreement to the extent of their comparative negligence or fault, as determined by a court of competent jurisdiction; provided, however, that the indemnified party must provide prompt written notification of any such claim, that the indemnifying party has full control of the defense and negotiation of settlement and as part of the defense of any such claim (provided no settlement admitting liability or imposing obligations on a party can be agreed to without such party's written consent), and such party will, at the indemnifying party's cost, use all commercially reasonable efforts to provide such assistance as the indemnifying party may reasonably require from time to time. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE, OR OTHER INDIRECT DAMAGES.

9. Notice. Any notice, request, demand or other communication which either party hereto wishes to give to the other party shall be in writing, unless otherwise agreed to by the parties, and shall be deemed properly given when served by facsimile, or deposited with the appropriate postal service authorities for transmittal by registered mail, postage prepaid. Such communications shall be sent to the following addresses, or such other addresses as the parties from time-to-time may agree upon:

If to GPI:          Graphic Packaging International, Inc.
                    1500 Riveredge Parkway
                    Atlanta, GA  30328
                    Attn.:  General Counsel
                    Facsimile:  770.644.2929


If to Packrite:     Packrite, LLC

1650 Packrite Court  
High Point, NC 27260  
Attn.: -Michael Drummond  
Facsimile: 336-884-1706

10. General.

A. This Agreement is not transferable or assignable by either party without the consent of the other, which shall not be unreasonably withheld, except that either party shall have the right without such consent to assign this Agreement to any of its parent, subsidiary or affiliated corporations or to any purchaser of all or substantially all of its assets. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

B. This Agreement contains the entire understanding between Packrite and GPI for the purchase and sale of the goods described herein, and there are no warranties of any kind, either expressed or implied, other than expressly set forth herein. This Agreement shall not be modified by acceptance by either party of any purchase order or confirmation issued by the other party and containing terms and conditions inconsistent herewith.

C. If any term or provision of this Agreement should be declared invalid by a court having jurisdiction, the remaining terms and provisions hereof shall be unimpaired and the invalid term or provision shall be replaced by a clause which, becoming valid, comes closest to the intention underlying the invalid term or provision.

D. Paragraph and subparagraph headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

E. No failure or delay on the part of either party in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy hereunder precluded any other or further exercise of any other right, power or remedy hereunder.

F. This Agreement shall be governed for all purposes by the laws of the State of Georgia.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first above written.

PACKRITE, LLC                                    GRAPHIC PACKAGING

INTERNATIONAL, INC.

By: _____          By: _____

Name: _____          Name: _____

Title:_____          Title _____

Date: _____          Date: _____

# APPENDIX A

GRAPHIC PACKAGING INTERNATIONAL, INC.
STANDARD TERMS AND CONDITIONS OF SALE FOR GOODS FROM THE UNITED STATES

1. **Shipment.** Shipment will be made EX-Works loaded, for non-export transactions within the United States.   For export sales, see Section 16.

2. **Title.** Title to and risk of loss or damage of the material covered by this order shall pass to Buyer at the delivery point specified.

3. **Taxes.**   Prices do not include sales, excise, use or other taxes now in effect or hereafter levied by reason of this transaction. All taxes are for the account of Buyer.

4. **Pricing.** Unless otherwise provided, all prices are subject to change upon 30 days written notice from Seller.

5. **Payment.** Unless otherwise agreed to in writing by the Parties, Seller's terms are Net 30 from the date of the invoice. However, if Buyer's financial responsibility or condition reasonably appears to call for such action, Seller may require payment in advance or security so that invoices will be paid when due. If Buyer becomes insolvent, commits an act of bankruptcy, fails to make payment when due, or fails to comply with Seller's aforesaid requirements, Seller reserves the right to withhold further deliveries or to terminate this Agreement and any unpaid amount shall thereupon become due immediately. Interest will be charged on any overdue amounts at 18% (eighteen percent) per annum or, if less, the highest rate permitted by law. If Seller should find it necessary to retain a collection agency and/or attorney to collect amounts overdue, the collection costs, including attorney's fees, shall be payable by Buyer.

6. **Warranty and Warranty Disclaimer.** Seller warrants that all materials sold pursuant hereto will conform to the description on the face of the quote attached hereto, subject to standard commercial tolerances, that such materials will be free from defects in materials and workmanship, and that it will convey good title hereto. The aforesaid warranties apply only to Buyer and are non-assignable. **Except as expressly set forth above, there is no warranty representation or condition of any kind, express or implied, including no warranty of merchantability or of fitness for particular purpose relating to such materials and none shall be implied by law.** As to the warranty expressly made above, any claim by Buyer on account of breach of warranty shall be deemed waived conclusively unless written notice thereof is given within ten days of Buyer's receipt of material and before use or alteration thereof. This warranty shall not apply to any material, which shall have been damaged in any way after shipment from Seller's plant or if the material is more than three months old. Seller shall have the right either to replace or repair any defective materials, to refund the purchase price or credit Buyer therewith, or with Buyer's concurrence, to grant a reasonable allowance on account of such defects, and Seller's liability and Buyer's exclusive remedy for defective materials shall be limited to replacement, repair, refund, credit or allowance as Seller may elect. Seller shall not be liable for any other loss or damages, direct, consequential, special or otherwise, occasioned by defects or deficiencies in the materials. Seller shall be given reasonable opportunity to investigate all claims and no materials shall be returned to Seller until receipt by Buyer of shipping instructions from Seller.

7. **Manufacture.** All notices relating to this Agreement or orders placed pursuant hereto must be in writing and any change in specifications or other provisions must be consented to in writing by both Buyer and Seller. Buyer agrees to hold Seller harmless from any and all claims arising from words or other matter imprinted upon the material relating to the attached quote or orders placed pursuant thereto at Buyer's direction, notwithstanding that Seller may have been consulted thereon. In the event that any word or words, trademark or trade name, or graphic information or design is imprinted on the merchandise sold hereunder, Seller accepts no responsibility or liability for compliance thereof with the Fair Packaging and Labeling Act of 1966, as amended, or the regulations issued pursuant thereto.

8. **Preparatory Work.** All prices are based on all preparatory materials (proofs, films, plates, cylinders and inserts) being furnished by the Buyer. In the event that Seller is called upon to either furnish the preparatory materials or to revise preparatory materials furnished by the Buyer, any charges incurred by Seller will be billed to the Buyer.

9. **Quantity Tolerances.** Tolerances of ten (10) percent plus or minus will apply to the quantity of materials specified in any order made pursuant to the attached quote.

10.  **Delays.** Seller shall not be liable for any failure in performance arising from strikes or other labor difficulties, labor shortage, fire, flood, war, breakdowns or failure of plant machinery or equipment, delays in or lack of transportation, Governmental priorities or allocations, delays of suppliers, or any other cause beyond the reasonable control of Seller. In the event of delay or failure of performance not excused in accordance with the preceding sentence, Seller's liability shall not exceed, and Buyer's exclusive remedy shall be limited to, the excess costs, if any, reasonably incurred by Buyer in procuring the undelivered portion of the material ordered from other sources. In no event shall Seller be liable for any consequential, special or contingent damages. No material will be held after the time designated for shipment, except by mutual consent, and except that Seller may delay shipments pending settlement of any overdue indebtedness under any order from Buyer to Seller. Delivery dates are approximate; delivery within a reasonable time of the dates specified herein shall be deemed full performance of the Seller's obligations under this contract.

11.  **Inventory.** The Buyer is obligated to take delivery of all inventory within 90 days of production. If goods remain in inventory at the end of the 90-day period, cartons will be invoiced to Buyer. If the final shipment date for goods is not agreed upon by the Buyer and Seller within 90 days of production, such goods will be warehoused at the Buyer's expense at a charge of 1.5% of invoiced value per month for up to 90 additional days. Prior to Seller agreeing to warehouse product beyond such 90-day period, Buyer is obligated to advise shipping date in writing. All promotional inventory is to be shipped prior to the out of market date. The Buyer will be notified of any promotional cartons remaining in inventory after expiration of the promotion and the Buyer is obligated to pay for such inventory.

12.  **Assignability.** The rights of either party hereunder are not assignable and goods sold hereunder are not to be shipped or delivered to any destination other than that herein specified, without consent of Seller; provided, however, that either party may assign its rights and responsibilities hereunder to the buyer of all or substantially all of its assets or stock.

13.  **Buyer Warranty and Indemnification.** Buyer warrants that any design or other matter lithographed or printed at the Buyer's request on any merchandise furnished hereunder will not infringe any trademark, copyright or other property right of another. Buyer shall indemnify, defend, protect and hold harmless Seller, its employees, agents, servants, successors and assigns from all costs, expenses (including reasonable attorneys' fees), damages or claims arising out of infringement or claim of infringement of any patent rights, trademark, tradename or copyright based on the sale, purchase or use of any design or other matter lithographed or printed at Buyer's request on any merchandise furnished hereunder.

14.  **Limitation of Liability.** Neither party shall be liable to the other for any consequential, special, indirect, or punitive damages under this Agreement.

15.  **Miscellaneous.**
    (a) These standard terms and conditions shall supersede all other representations and statements, verbal or written, relating to goods specified herein unless the sale of such goods is subject to a written contract, signed by the Seller and the Buyer, in which case any terms therein which differ from or conflict with the standard terms and conditions set forth herein shall control. Brokers and salesmen have no authority to waive charges or add to any of the terms or conditions. These standard terms and conditions may be modified only by an agreement in writing signed by the authorized representatives of both parties.
    (b) The waiver of any term, condition, or provision, hereof shall not be construed to be a waiver of any other term, condition, or provision hereof, nor shall such waiver be deemed a waiver of a subsequent breach of the same term condition or provision.
    (c) The sale of goods subject to these standard terms and conditions shall be governed by the laws of the State of Georgia.
    (d) This Order may not be cancelled or modified, in whole or in part by the Buyer after acceptance by Seller, except upon Seller's written consent.

16.  **Provisions Applicable to Sales for Export Only.**
    (a) For sales between the U.S. and Canada, all shipments shall be shipped DDU Buyer's location (Incoterms 2000) unless otherwise agreed by the parties. Title and risk of loss shall pass at the DDP point.
    (b) For sales from the U.S. to Mexico, shipments shall be shipped DAF designated border point (Incoterms 2000), unless otherwise agreed by the parties. Title and risk of loss shall pass at the DAF point.
    (c) For sales from the U.S. or Canada to any other countries, shipments shall be shipped FCA named point of departure (Incoterms 2000), unless otherwise agreed by the parties.
    (d) The selling price in an export order where Seller is required to pay customs, tax and/or duties is based on Seller paying present rate duty, tax and/or customs on present valuation at port of shipment. Any change in rate or advance or decline in value necessitating a change in the amount of U.S. duty, tax, and/or customs is for the account of the Buyer.

7

(e) The price set forth in the attached pricing or quote is payable in U.S. Dollars unless otherwise specified therein.

(f) Neither the Convention relating to a uniform law on the International Sale of Goods 1964 nor the United Nations Convention on Contracts for the International Sale of Goods 1980 will apply to this Agreement.

(g) Unless the provisions of this section require the contrary, all applicable provisions of these Terms and Conditions of Sale shall apply to export sales.

8

# APPENDIX B
## Pricing and Specifications for Materials

**From:** Kevin Brown
**Sent:** Friday, May 26, 2017 10:28 AM
**To:** Dover, Kristopher
**Subject:** State of our business
**Attachments:** Kris Dover.docx

Kris,

I've attached a letter here for you to review when you have a moment. Please call me with any questions.

Have a great Memorial Day weekend!

Regards,

Kevin M. Brown

Partner/Business Development - AE
Packrite LLC
1650 Packrite Court
High Point, NC 27260
(336)884-9468 office
(336)250-1640 cell
kevinb@packrite.net
www.packrite.net



1



**Micro Flute
Packaging**

**Paper Board
Packaging**

Kristopher Dover
Corporate Director of Manufacturing
Graphic Packaging International
1500 Riveredge Parkway, Suite 100
Atlanta, GA 30328

Dear Kris,

I'm writing this letter to review where we have been with our efforts to secure a long term commitment from GPI on the MillerCoors business and where we are going. Back in August of 2016 Packrite was approached by Chris Berndt, Tom Fester and Jeb Pfeifle regarding the GPI onboarding effort for the Clorox Kitty Litter business. We were asked to commit resources and earmark a large amount of production capacity on a week to week basis to help GPI bring on the business and follow through on the initial inventory build and subsequent production requirements.

While this was happening GPI made investments in new equipment for Solon, specifically a new cutter and folder/gluer. At the time we were told that Solon was oversold and because the new equipment would not be up and running until the end of first quarter 2017 it was imperative that Packrite agree to commit resources for the Clorox launch. That commitment required "flexing up" our labor force and production capacity. It also required that Packrite make capital investments in new equipment for a quality lab to ensure data capture. Our company hired new people, enhanced our quality department, developed new SOPs and committed many hours to training our workforce all in effort to make GPI's "major initiative" successful. Needless to say we were breaking new ground with regard to production processes and material combination and at times it felt like drinking water through a firehose.

Part of the agreement to help GPI onboard Clorox was that Packrite would no longer run miscellaneous CPD items out of Solon. We would, however, continue to run some sheet fed MillerCoors business while maintaining Clorox as the #1 priority. Packrite's initial Clorox commitment on capacity was to laminate 1,000,000 sheets per month, dedicate almost all of our die cutting capacity while folding/gluing up to 500,000 boxes per month.

All parties involved understood that when Solon got both the new cutter and new gluer up and running between April and May of 2017 most cutting and gluing would be transitioned up to the Solon plant while roll to roll lamination remained at Packrite. The void left by the transition of Clorox up to Solon would then be filled by a contract for roll to roll 18/12 MillerCoors cartons. That was the commitment communicated to Packrite by GPI representatives on numerous occasions and that is why we had our initial meeting with you and Ryan Ingalls in September of 2016.

Working with Ryan, Adam and Jacob and the beverage group has been a pleasure from the beginning. In the last 8 months we've also worked with Troy's group in Perry to establish roll to roll production, we've seen and reviewed the initial draft of a contract which was sent back to GPI by our attorneys and we have completed a successful PTP in Golden, CO. Our team has taken a proactive approach to procuring materials on a regular

basis, in good faith without actual POs, in order to facilitate time lines for testing and the PTP schedule. We currently have roll stock in house for the 6 brewery PTP we were told was imminent but now appears to have been pushed back to September. Packrite has made preparations and capacity planned around numerous verbal confirmations and a commitment that roll to roll beer would go live in the first half of 2017. As recently as April 20th Brittany and I were told that we would be getting a PO to cover the first month of production followed by POs to cover an entire quarter of business while we waited on your legal team to get back to us with the contract.

Packrite's relationship with GPI goes all the way back to 2012. Without question we've had our share of challenges and some ups and downs throughout our time doing business together. In spite of the challenges both companies have faced we've been loyal, persevered and continued to dedicate much of our capacity and our people to the GPI effort. Our group has been as transparent and forthcoming as possible and I believe most at GPI understand our limitations as a smaller company. Since the launch of Clorox we have welcomed GPI staff into our plant to monitor and audit our production and quality process on a weekly basis and that is simply an illustration that GPI has become more than a customer to Packrite, GPI has been a partner.

At this time we are trying to understand where we stand with GPI's commitment on the MillerCoors business. Chris Berndt committed to Packrite that we would run all of the 18/12 cartons if we committed the capacity to cut Clorox until Solon's new cutter was up and running around May 4, 2017. That commitment included running 1,000,000 cartons over the last 6 weeks leading up to that date. We have built our capacity plan and workforce around that commitment.

I understand there was a staff meeting in Chicago last week and I'm sure everyone is busy but we were going to have a follow up call on May 15th. We would like to set up a meeting to sit down with you and your group to discuss where this partnership is going. We have the balance of 2017 to plan for and right now we do not see a clear picture. I'll follow this letter up with a call so we can lock in a date.

Thanks for your consideration,


Kevin M. Brown



Partner/Business Development – AE
Packrite LLC
1650 Packrite Court
High Point, NC 27260
(336)884-9468 office
(336)250-1640 cell
kevinb@packrite.net
www.packrite.net

**P.O. Box 2438 High Point, NC 27261    \*    1650 Eastway Court High Point, NC 27260**

**Phone: 336.884.0793    \*        336.884.1706 Fax**